Billy G. CHAMBERS, Jr., and John William Angell, Jr., on behalf of themselves and all other persons similarly situated, Plaintiffs,

v.

McLEAN TRUCKING COMPANY, INC., Spector Freight Systems, Inc. and International Brotherhood of Teamsters, Local Union No. 391, Defendants.

No. C-79-388-WS.

United States District Court, M.D. North Carolina, Winston-Salem Division.

Sept. 25, 1981.

Order of Dismissal March 15, 1982.

B. Ervin Brown, II, Badgett, Calaway, Phillips, Davis, Stephens, Peed & Brown, Winston-Salem, N.C., and Beverly C. Moore, Jr., of Law Offices of Beverly C. Moore, Jr., Washington, D.C., for plaintiffs.

Wayne H. Foushee and Claude M. Hamrick, Legal Dept., William D. Spry, Jr., Allman, Spry, Humphreys & Armentrout, Winston-Salem, N.C., Melvin R. Manning, McCaul, Grigsby & Pearsall, Richmond, Va., and Norman B. Smith, Smith, Patterson, Follin, Curtis, James & Harkavy, Greensboro, N.C., for defendants.

## MEMORANDUM OPINION AND ORDER

### HIRAM H. WARD, Chief Judge.

This is an action by plaintiffs,[1] Billy G. Chambers, Jr. and John William Angell, Jr., against their employers for breach of their collective bargaining agreement and against their union local for breach of the duty of fair representation. 29 U.S.C. § 185. It is before the Court for ruling on numerous motions filed by the various parties. Those motions and the order in which the Court will discuss them are listed below:

(1) Plaintiffs' motions to amend, Fed.R.Civ.P. 15(a);

(2) Plaintiffs' motions to strike affidavits and to offer the deposition of Robert T. Flynn (hereinafter Flynn Deposition) taken in the case of *Overton v. McLean Trucking Co.,* C–80–381–WS (M.D.N.C. May 18, 1981), into evidence;

(3) Plaintiffs' motion for partial summary judgment and amended motion for partial summary judgment, Fed.R.Civ.P. 56, and defendants' motions to dismiss or, in the alternative, for summary judgment, Fed.R.Civ.P. 12(b)(6) & 56;

(4) Plaintiffs' motions for extension of time to move for class certification and for class certification and defendants' motions for denial of class certification, Fed.R.Civ.P. 23;

(5) Plaintiffs' motion to compel discovery, Fed.R.Civ.P. 37(a);

(6) Plaintiffs' motions to consolidate this case with *Overton v. McLean* and for leave to file a consolidated amended complaint.

### Motions to Amend

Plaintiffs seek to amend their complaint to alter the dates during which they allege defendant companies, McLean Trucking Co., Inc. (McLean) and Spector Freight Systems, Inc. (Spector) breached their agreement and to particularize the alleged breach of the duty of fair representation by International Brotherhood of Teamsters, Local Union No. 391 (Local 391). They also wish to request compensatory and punitive damages from Local 391. Punitive damages are not recoverable in this action. *IBEW v. Foust,* 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979). Therefore, the Court will deny plaintiffs' request concerning punitive damages as frivolous. 6 C. Wright & A. Miller, *Federal Practice & Procedure* § 1487 (1971). It will also deny the rest of plaintiffs' request in light of its decision to allow plaintiffs to file their proposed consolidated complaint.

### Motions Concerning Materials in Support of Summary Judgment

Plaintiffs contend that much of the information contained in three of the affidavits submitted by defendants is not within the personal knowledge of the affiants. These affidavits include those of R. Larry Wert, William G. McIntyre and W.C. Barbee (April 17, 1980) (hereafter Wert, McIntyre & Barbee Affidavits). Wert, assistant to the employer chairman of the National

---

1. The two named plaintiffs purport to sue on behalf of a class. In this Memorandum Opinion and Order, the Court will refer to only the two persons named as *plaintiffs.*

Negotiating Committee and the National Grievance Committee,[2] set forth in his affidavit matters with which he became familiar or in which he actually participated because of his position on the national level as well as matters which occurred on local bargaining and grievance levels with which he probably had no firsthand knowledge. Most all of those latter matters, however, are documented by other evidence in the file. McIntyre, employer chairman of the National Negotiating Committee and the National Grievance Committee, substantiated Wert's version of the proceedings and intentions of those committees, matters with which McIntyre is intimately knowledgeable. Barbee, former president of Joint Council No. 9, comprising Teamsters locals in North and South Carolina, union chairman of the Carolina Bi-State Grievance Committee, and member of the Carolina Supplemental Negotiating Committee, stated matters concerning the activities of those two committees but gave only his understanding of events which occurred elsewhere. In deciding the motions for summary judgment, the Court will only consider statements which these affiants have made based on their knowledge gained through their positions. It will not strike those affidavits in their entirety merely because they contain a few statements as to the affiants' understandings rather than knowledge.

Plaintiffs ask the Court to allow them to use the Flynn Deposition in evidence in this case although it was taken in a companion case. The Court suspects that plaintiffs filed the companion case to, *inter alia,* allow them to continue with discovery which had ended in this case. If defendants had presented the Court with the chance, it might have prevented the taking of the Flynn Deposition absent a showing which required reopening of discovery in this case. Nevertheless, the Court feels it should consider that deposition for purposes of the parties' summary judgment motions because the deposition represents evidence which plaintiffs likely could develop at trial.

In any event, the Court is going to consolidate this case with *Overton* and allow use of materials in both cases jointly. The Court, therefore, will grant plaintiffs' motion to that extent.

*Summary Judgment Motions*

■ Because the Court has received and considered matters outside the pleadings with reference to defendants' motions to dismiss or, in the alternative, for summary judgment, it will treat those motions purely as ones for summary judgment. Fed.R. Civ.P. 12(b); *George v. Kay,* 632 F.2d 1103, 1106 (4th Cir.1980) (no need to give notice and opportunity to. file responsive materials); *Plante v. Shivar,* 540 F.2d 1233, 1235 (4th Cir.1976); *Blanks v. Register,* 493 F.2d 697, 699 (4th Cir.1974) *cert. denied,* 419 U.S. 841, 95 S.Ct. 72, 42 L.Ed.2d 68 (1974) (oral notice at hearing).

■ That both sides to a case have moved for summary judgment does not change the normal standards for judging such motions. It does not establish the absence of genuine issues of fact or require the Court to grant judgment to one side or the other. The Court must consider each motion separately to see if no genuine issue of material fact exists. Neither side concedes the truthfulness of its adversaries' evidence other than for the purposes of its own motion. The nonmoving side as to each motion is entitled to all inferences which may arise from the evidence. In the ultimate analysis, the Court may deny judgment to all parties if warranted. *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *Cram v. Sun Insurance Office, Ltd.,* 375 F.2d 670, 673–74 (4th Cir.1967); *American Fidelity & Casualty Co. v. London & Edinburgh Insurance Co.,* 354 F.2d 214 (4th Cir.1965); 10 C. Wright & A. Miller, *Federal Practice & Procedure* § 2720 (1973).

During times relevant to this suit plaintiffs were represented by Local 391. Chambers worked for McLean and Angell worked

---

**2.** See the discussion of the parties' summary judgment motions, *infra,* pp. 1338–1345, concerning various negotiating and grievance committees.

for both McLean and Spector as casual employees. They and the other members of their purported class worked under the National Master Freight Agreement in effect from April 1, 1976, to March 31, 1979 (NMFA), Barbee Affidavit Exhibit C. Neither a Spector or McLean group health insurance program covered their casual employees during May 30, 1976, through March 31, 1979. The casual employees were not allowed to participate in the Teamsters Central States Health and Welfare Fund. Deposition of James B. Goff pp. 9 & 16 (March 12, 1980) (hereafter Goff Deposition); Deposition of Robert S. Bell p. 23 (March 12, 1980) (hereafter Bell Deposition).

Article 53 of the Carolina Freight Council City Cartage Supplemental Agreement (Supplemental Agreement) to the NMFA provided in part as follows:

> Effective May 30, 1976, the Employer shall pay casual employees 50¢ per hour, in addition to the hourly rate, for time worked, not to exceed $4.00 per day so as to provide their own health and welfare insurance coverage. This payment shall not be subject to overtime, and shall not be required if the health and welfare contributions established by the Supplemental Agreement (weekly, etc.) have been paid on his behalf, or if health insurance is provided as interpreted by the National Committee.

Spector paid the 50 cents per hour only to those casual employees who specifically requested it. Goff Deposition p. 15. Spector employed 236 casuals within the jurisdiction of Local 391, Goff Deposition p. 13; only 31 of the casuals employed in all of North and South Carolina, which includes several other locals, requested payment. Goff Deposition p. 15. Until January 17, 1977, McLean paid only preferential casuals, Supplemental Agreement Article 59, Sec. 12, the additional amount.[3] Only 11 persons within North and South Carolina fit within this category. Bell Deposition pp. 17–19. McLean employed 753 casuals within the jurisdiction of Local 391. McLean's Response to Plaintiffs' Second Request to Produce (January 21, 1980). On January 17, 1977, McLean began to pay 50 cents per hour to all North and South Carolina casuals but did not pay them retroactively. Bell Deposition p. 17. Plaintiffs seek to recover 50 cents per hour payments for times during which they worked while the Supplemental Agreement was in effect and they were not paid the 50 cents.

Joseph Ellen, a preferential casual at McLean, claims that he submitted a complaint to Local 391 on behalf of all casuals not receiving the 50 cents per hour within 10 days of May 30, 1976, when the 50-cent provision became effective. He contends he first gave his complaint to a Mr. Britt, a shop steward, who refused it. He alleges that George Williams, another shop steward, later accepted his complaint but that he never heard anything concerning it again. Affidavit of Joseph Ellen (May 30, 1980). Curiously, as stated previously, the preferential casuals, including Ellen, began receiving 50 cents per hour extra soon thereafter. Williams has stated that Ellen could have given him a complaint but he does not recall Ellen doing so. He is fairly certain that the procedures he customarily used would have prevented loss of a complaint. Deposition of George W. Williams, Jr. pp. 6–9 (February 19, 1980). No evidence suggests that Ellen ever inquired further about his complaint. This evidence concerning Ellen's alleged complaint creates an issue of fact which the Court cannot settle. Viewing the evidence in a light most favorable to plaintiffs leads to the conclusion that Ellen tendered a complaint which the union failed to process as a grievance. Giving defendants all favorable inferences raises the possibility that Ellen never tendered the complaint. In any event, the credibility of Ellen is crucial on this point. 10 C. Wright & A. Miller, *Federal Practice & Procedure* § 2726 (1973). As discussed at p. 1345 *infra*, this

---

**3.** McLean awarded the preferred casuals the payments effective July 1, 1976. Bell Deposition p. 20.

genuine issue is not material to anyone but Ellen.

On June 22, 1976, Local 391, pursuant to employee complaints, filed a grievance against Roadway Express (Roadway) on behalf of casual employees at Roadway concerning the 50-cent provision. It filed similar grievances on the dates set forth below:

| | | |
|---|---|---|
| 1. | Branch Motor Express (Branch) | June 21, 1976 |
| 2. | Pilot Freight Carriers, Inc. (Kernersville, N.C.) (Pilot) | July 21, 1976 |
| 3. | Pilot Freight Carriers, Inc. (Laurinburg, N.C.) (Pilot) | July 21, 1976 |

Deposition of Charles S. Williams pp. 24–26 & Exhibits Q, R, S & T (February 19, 1980) (hereafter C. Williams Deposition).

Articles 43 and 44 of the Supplemental Agreement in conjunction with Articles 7 and 8 of the NMFA established a grievance machinery. In situations like the 50-cent dispute, the grievance process could proceed to the next step only if the prior step resulted in a deadlock. A majority decision reached at any step was final and binding. The Roadway grievance was deadlocked at the first two steps in the process—the local Carolina Bi-State Grievance Committee and the regional Eastern Conference Grievance Committee. Barbee Affidavit Exhibit B. When it reached the final step—the National Grievance Committee—that committee, rather than decide the specific grievance, issued guidelines concerning payment of the 50 cents per hour. Those guidelines, provided:

1. Fifty cents (50¢) per hour, up to a maximum of ($4.00) per day Health & Welfare contribution, is to be paid each part-time/casual employee who works in a job classification covered under the Virginia or Carolina Cartage Supplements.

2. An employer must determine before employing a part-time/casual employee if that employee has current Health & Welfare coverage.

3. There shall be the following exclusion to the above guidelines: No 50¢ per hour payments in lieu of Health & Welfare coverage shall be required if the part-time/casual employee in question is covered for the time worked under a Health & Welfare plan established by the Supplemental Cartage Agreement.

4. If a part-time/casual employee has a dispute over the failure, on the part of his employer, to comply with the above, that dispute shall be subject to the grievance procedure for final determination.

5. Any dispute or grievance for Health & Welfare payments of individual part-time/casual employees should be handled using the above stated guidelines. Based on the guidelines, the employer shall pay the part-time/casual employees who filed grievances in Case No. N–3–77–E2 (Local 391 vs. Roadway).

6. Any grievance on hand/file as of March 10, 1977, should be handled using the above stated guidelines.

Wert Affidavit Exhibit B.

Subsequent to promulgation and distribution of the guidelines, the other three cases reached the Carolina Bi-State Grievance Committee and were deadlocked both there and before the Eastern Conference Grievance Committee. The companies raised procedural questions. Barbee Affidavit Exhibits D, E & F. All four cases were settled pursuant to the guidelines in September 1977. Flynn Deposition Exhibits 12B–E. Casual workers involved were to be paid retroactively, beginning on the effective date of the Supplemental Agreement, if they qualified under the guidelines. Local 391 received the guidelines on April 4, 1977, and posted copies at all terminals within its jurisdiction two or three days thereafter. Durham Deposition pp. 34–35 & 42.

After learning of the guidelines, R.V. Durham, president of Local 391, sought to verify his understanding of the guidelines through Robert T. Flynn, executive assistant to the director of the Eastern Conference. Durham Deposition pp. 23–24; Flynn Deposition Exhibits 2, 3, 9, 10 & 14. On May 2, 1977, Flynn telegraphed Durham the following statements.

REFERENCE IS MADE TO YOUR LETTER OF APRIL 20, 1977, CONCERNING THE GUIDELINES FOR HEALTH AND WELFARE PAYMENTS FOR PART–TIME/CASUAL EMPLOYEES.

*ANY GRIEVANCE THAT WAS NOT FILED BY THE UNION AND IN THE HANDS OF THE EMPLOYER PRIOR TO MARCH 10, 1977 WILL NOT BE HONORED. ANY GRIEVANCE WHICH WAS FILED PRIOR TO MARCH 10, 1977 MUST BE HONORED. ARTICLE 7 OF THE NATIONAL AGREEMENT PROVIDES THAT "AUTHORIZED REPRESENTATIVES OF THE UNION MAY FILE GRIEVANCES ALLEGING VIOLATION OF THE AGREEMENT UNDER LOCAL GRIEVANCE PROCEDURE OR AS PROVIDED HEREIN." ACCORDINGLY LOCAL 391'S GRIEVANCE AGAINST PILOT FREIGHT CARRIERS FILED JULY 21 1976 ON BEHALF OF EMPLOYEES AFFECTED APPEARS TO BE A VALID GRIEVANCE. THE EMPLOYER SHOULD MAKE THE NECESSARY RECORDS AVAILABLE TO THE UNION UPON REQUEST TO DETERMINE THE MONIES DUE AND OWING UNDER THIS GRIEVANCE.[4]*

Durham Deposition Exhibit M; Flynn Deposition Exhibit 5 (emphasis in original).

On May 23, 1977, two McLean employees, D.B. Tesh and David L. Walser, submitted a complaint to Local 391, on behalf of named casuals seeking the 50 cents per hour from May 30, 1976, through January 17, 1977, when McLean began to pay voluntarily. Chambers was one of those named casuals. The Local 391 business agent for their terminal, Charles Williams, processed that complaint as a grievance. C. Williams Deposition pp. 21 & 36 & Exhibit H. At the Carolina Bi-State Grievance Committee hearing on that grievance, a copy of Flynn's May 2, 1977, telegram was put into evidence. The claim of the casual employees was denied by that committee on October 13, 1977. Barbee Affidavit Exhibit G; C. Williams Deposition Exhibit G. On March 8, 1978, Angell tendered complaints on behalf of all similarly situated casuals at McLean and Spector to Williams. C. Williams Deposition Exhibits E & K. Williams

did not process the complaint against McLean because Angell was similarly situated with those casuals named in the May 1977 grievance. C. Williams Deposition pp. 26–29. He gave the Spector complaint to the business agent serving Spector employees. That agent did not file a grievance. Rather, that agent settled with the company on the basis that Angell would be paid for time he had worked within ten days of filing the complaint. C. Williams Deposition pp. 30–33. Angell had not worked for Spector during that 10-day period. Goff Deposition p. 28.

Two or three similar complaints were filed with Local 28, International Brotherhood of Teamsters (Local 28), against Spector in South Carolina before March 10, 1977. Others were filed after that date. James Goff, director of Labor Relations for Spector had Spector to pay retroactively those employees who filed pre-March 10 complaints. Goff Deposition pp. 18–26. On May 27, 1977, Local 28 filed a grievance on behalf of those casuals at Spector who had complained about not receiving 50-cent payments. The Carolina Bi-State Grievance Committee on November 8, 1977, instructed Spector to pay the claimants 50 cents per hour for hours worked 10 days prior to the filing of the respective complaints. Barbee Affidavit Exhibit H.

Plaintiffs allege that union breaches of the duty of fair representation occurred in two manners. First, they contend the grievance procedure was improperly influenced by their union as reflected in the allegedly erroneous Flynn telegram which interpreted the National Grievance Committee guidelines. This influence, they allege, was the culmination of collusion between the companies and union entities to defeat employees' claims. Second, they contend that Local 391 and, for class action purposes, other locals in North and South Carolina should have filed grievances against McLean and Spector before March 10, 1977, on behalf of all casuals.

---

4. Durham's inquiry which resulted in Flynn's telegram concerned Pilot's failure to comply with Durham's interpretation of the guidelines. Flynn Deposition Exhibit 9.

■ Before discussing the merits of plaintiffs' claims, the Court must address defendants' statute of limitations defense. The Court concludes that plaintiffs' claim that Local 391 and higher level Teamsters entities breached their duty of fair representation in a manner which caused the Carolina Bi-State Grievance Committee to deny the 1977 grievance against McLean is time-barred by N.C.Gen.Stat. § 1–567.13(b) (Cum.Supp.1979). *United Parcel Service, Inc. v. Mitchell,* 451 U.S. 56, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981) (citing *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975)); *UAW v. Hoosier Cardinal Corp.,* 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966); *Sine v. Local 922, IBT,* 644 F.2d 997 (4th Cir.1981). That North Carolina 90-day period of limitation is the most analogous state statute. Applying it reasonably to this case, the Court does not believe that it requires extending plaintiffs' time for filing suit into 1979. Nevertheless, as an alternative, the Court will address the merits of plaintiffs' claim concerning the allegedly tainted grievance proceeding. Any recovery based on union breaches other than failure to file grievances before March 10, 1977, would require overturning that grievance decision.

■ Plaintiffs' claim that locals should have grieved against McLean and Spector before March 10, 1977, is not time-barred. An allegation that a union refused to file a requested grievance or failed to file one on its own initiative when it had a duty to do so does not raise the possibility that the Court would have to vacate a grievance decision. The 90-day limitation of § 1–567.13(b) does not apply. *Howard v. Aluminum Workers,* 589 F.2d 771 (4th Cir.1978), requires that the Court apply North Carolina's three-year limitation period. N.C.Gen. Stat. § 1–52 (Cum.Supp.1979). The three-year period applies whether plaintiffs' claims are construed as arising in contract or tort or by statute. N.C.Gen.Stat. § 1–52(1), (2) & (5). Plaintiffs filed this action within three years of the date the 50-cent provision became effective. Any failure to file a grievance concerning that provision necessarily occurred after that effective date. If plaintiffs could prove Local 391 breached its duty of fair representation in this regard, they also would not be time-barred from proving the companies' breaches.

■ Turning to the merits of plaintiffs' claims, the Court recognizes that a union breaches its duty of fair representation whenever its conduct is arbitrary, discriminatory or in bad faith. *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). A union must at all times conform its conduct to the standards set forth in *Vaca v. Sipes:*

> First, it must treat all factions and segments of its membership without hostility or discrimination. Next, the broad discretion of the union in asserting the rights of its individual members must be exercised in complete good faith and honesty. Finally, the union must avoid arbitrary conduct. Each of these requirements represents a distinct and separate obligation, the breach of which may constitute the basis for civil action.

*Griffin v. UAW,* 469 F.2d 181, 183 (4th Cir.1972).

If a union, in collusion with an employer or otherwise, acted so as to create a procedural bar, not provided for in the relevant contract, to the assertion of certain rights by employees, such conduct would surely violate the union's duty. However, the Court concludes as a matter of law that neither Local 391 or any other Teamsters entity did such in this case. Plaintiffs theorize that the Supplemental Agreement allowed employees to complain concerning the 50-cent provision at any time during the effectiveness of the agreement and receive the extra 50 cents back to May 30, 1976, if they qualified. Plaintiffs argue that union and company personnel decided that, to cut off some employees claims after March 10, 1977, employees should receive only 50-cent payments for 10 days prior to the time they filed their complaints. This decision, plaintiffs feel, caused the Carolina Bi-State Grievance Committee, and would have caused any other grievance committee

presented with the question, to refuse payment to complainants more than 10 days retroactive to filing of a complaint.

No doubt exists that, in ruling in October 1977, the Carolina Bi-State Grievance Committee relied on a 10-day limit. The Flynn telegram was placed into evidence. The Committee did not rule as a preliminary matter that the grievance was barred by the 10-day rule which would have ended the hearing without further evidence. Even applying a 10-day rule, it would need to know whether any of the employees had failed to receive the payments within the 10-day period. They had all received payments since January 1977 so the claim was denied. The Committee did not say explicitly that it was applying a 10-day rule, but that is the only logical explanation for its denying the grievance on the evidence presented. Later, in hearing the Local 28 grievance against Spector, the committee ordered Spector to pay those Spector employees for 10 days prior to the filing of their complaints.

■ Plaintiffs are incorrect, however, in arguing that the union and companies arbitrarily imposed the 10-day rule. Article 44, Sec. 4 of the Supplemental Agreement provided in pertinent part:

> All grievances must be made known to the other party, in writing, within ten (10) days after the reason for such grievance has occurred .... If unable to settle such grievance within a total of twenty (20) days after reason for such grievance has occurred, such grievance must be reduced to writing and submitted to the Employer and Chairmen of the Bi-State Grievance Committee or the complaint will be automatically voided, except where there is a proven violation of wage provisions in this contract. Wage provisions are interpreted to mean ... the hourly rate (including the overtime rate).

The 50-cent provision in question was set forth in Article 53 entitled "Health and Welfare;" the hourly rate of pay is set forth in Article 58 entitled "Wages." Based on these provisions, the time limitations for grievances are susceptible of only one reasonable interpretation—if an employee has a complaint concerning whether he is being paid the wage rate set forth in Article 58, he may lodge that complaint anytime while the contract is in effect; if his complaint concerns health and welfare benefits, including the 50 cents in lieu thereof, he must see that the company receives written notice of his complaint within 10 days after the time the company fails to properly grant the benefits. In other words, the Supplemental Agreement provided that a casual who successfully complained could only receive 50 cents per hour worked for the period beginning 10 days before the company received written notice of the complaint.

This construction of the grievance time limits as applied to the 50-cent provision is also consistent with all the evidence before the Court concerning the intent of the parties in negotiating the 50-cent provision. Wert Affidavit pp. 2–3; McIntyre Affidavit pp. 1–2; Durham Deposition p. 8. The National Negotiating Committee negotiated, at least in principle, items such as general wage rates and health and welfare benefits for casuals for inclusion in various supplemental agreements. That committee transmitted those terms to the supplemental negotiating committees for either verbatim inclusion or negotiation of specific language to implement those items. Wert Affidavit Exhibit A. The directors from the National Negotiating Committee concerning health and welfare benefits for casuals provided:

### Pension, Health and Welfare for Casuals and Extras.

If the Supplemental Agreement does not now provide for payments to the Health and Welfare plan established by such Agreement on behalf of casual or extra employees or if health insurance is not provided, then casual or extra employees shall receive 50¢ per hour for time worked, not to exceed $4.00 per day so as to provide their own health and welfare insurance coverage.

This payment shall not be subject to overtime.

A supplemental agreement which provided for contributions to a health and welfare fund on behalf of casuals had no need for incorporation of the 50-cent provision. Treating the 50-cent provision as a wage rate would have led to the incongruous result that a casual working under such an agreement would have no time limit for complaining concerning failure to contribute whereas a casual working under the agreement involved here would have a time limit in which to complain concerning failure to pay 50 cents. Also, an hourly rate of pay would have been subject to overtime. The 50-cent provision was not. Furthermore, the 50-cent provision became effective later than the hourly rate provisions. Contrary to plaintiffs' argument, treatment of the 50 cents per hour by the Internal Revenue Service or any other agency has no bearing on whether the negotiators intended to treat it as a wage or fringe provision for grievance purposes.

The negotiators of the 50-cent provision had some doubt as to which casuals would qualify for payment. Wert Affidavit p. 4; McIntyre Affidavit p. 1; Barbee Affidavit p. 2; Durham Deposition p. 8. Naturally, the union locals and especially the companies which operated under the Supplemental Agreement were even more confused. *E.g.,* Bell Deposition pp. 12–13; Barbee Affidavit Exhibit B. The provision appeared to contemplate that the National Negotiating Committee would further explain what it would require of the companies. The Roadway, Branch and Pilot grievances were so-called "shotgun grievances." Local 391 did not name individual employees but, rather, grieved on behalf of all employees at a particular plant. To this the companies objected. They also objected to the lack of specificity in the grievances and, of course, argued that the 50-cent provision was not a wage rate. Barbee Affidavit Exhibits B, D, E & F. When the Roadway grievance reached the National Grievance Committee, the committee was faced with the union position that all casuals not covered by company health and welfare contribu-

tions should receive payments retroactively on one hand and the company procedural objections on the other. The committee's resultant guidelines, although inartfully drawn, reflect a compromise. Because of the ambiguity concerning who was covered by the 50-cent provision, procedural requirements were waived for all grievances filed by March 10, 1977. Some employees covered by such grievances would receive payments back to May 30, 1977, whether they had filed complaints untimely or not even filed complaints at all. Wert Affidavit pp. 6–7; McIntyre Affidavit p. 1. Employees who were not covered by pre-March 10, 1977, grievances have no reason to complain if they failed to attempt to exhaust their remedies under the collective bargaining agreement. *See* p. 1345, *infra.*

Plaintiffs were not duped by receiving notice of the guidelines after a supposed deadline for filing complaints. The guidelines were posted, first, to inform casuals already covered by grievances to make claims for the specific amount of money due and, second, to tell other casuals that if they were not receiving proper payment to employ the grievance procedure to begin forcing payment. · Durham Affidavit pp. 35–37 & Exhibit Z. Plaintiffs thereafter attempted to employ that procedure. The Carolina Bi-State Grievance Committee's subsequent rulings were consistent with the Supplemental Agreement and the guidelines. The Flynn telegram did not improperly influence that committee.[5] Local 391 had no duty thereafter to press Angell's grievance against McLean. It settled Angell's grievance against Spector in accordance with the Supplemental Agreement and the guidelines.

Plaintiffs' argument that Local 391 should have processed grievances against McLean and Spector either on its own initiative or because of the alleged Ellen complaint runs afoul of a settled principle of labor law. Individuals who sue their employers for breach of a collective

---

5. By saying post-March 10 grievances should not be honored, Flynn obviously meant they should not be honored for more than 10 days retroactively.

bargaining agreement must first *attempt* exhaustion of remedies under that agreement. When they must do so through their exclusive bargaining representative as required in this case, Supplemental Agreement Article 44, Sec. 1(g), three exceptions to this exhaustion principle might arise: (1) the company might repudiate the agreement; (2) the union might refuse to process a complaint; or (3) to attempt exhaustion might be futile. *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 563, 96 S.Ct. 1048, 1055, 47 L.Ed.2d 231, 240–41 (1976); *Glover v. St. Louis-San Francisco Railway,* 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969); *Vaca v. Sipes,* 386 U.S. at 184–86, 87 S.Ct. at 913–14, 17 L.Ed.2d at 854–55; *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965). The Court is aware of no precedent which requires a union to attempt exhaustion on its own initiative. Quite properly the practice at Local 391 is for an employee to first file a complaint. Durham Deposition pp. 11–12; C. Williams Deposition pp. 7 & 9. No evidence exists that McLean or Spector had repudiated the grievance procedure. Except for their later 1977 and 1978 complaints, plaintiffs had not requested the filing of grievances on their behalf. Futility is the only exception on which they could arguably rely.

■ Assuming, as the Court must on defendants' summary judgment motions, that Ellen tendered a complaint, no evidence suggests that failure to process that complaint rendered futile a subsequent attempt by plaintiffs. Merely that a steward seemingly failed to follow up on one complaint, without more, is not sufficient. No pattern of refusal to process grievances had developed. *E.g., Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870 (3d Cir.1972); *Gray v. International Association of Heat & Frost Insulators,* 447 F.2d 1118 (6th Cir. 1971). Plaintiffs put forward no reason to feel that union representatives on the grievance panel would discriminate against them. *Glover v. St. Louis-San Francisco Railway,* 393 U.S. 324, 89 S.Ct. 548, 21

L.Ed.2d 519; *Battle v. Clark Equipment Co.,* 579 F.2d 1338 (7th Cir.1978). In fact, casuals at other companies were successfully pursuing their remedies. Ellen himself might have reason to complain that Local 391 breached its duty to him by not processing his complaint.[6] Plaintiffs might have benefited if Local 391 had turned Ellen's complaint into a grievance on behalf of all casuals at McLean. However, the possibility of this fortuity does not bootstrap plaintiffs into the position of escaping the exhaustion bar. When they did attempt exhaustion their complaints were properly handled in light of the 10-day rule.

■ Neither Local 391 or another Teamsters entity breached its duty of fairly representing plaintiffs. That conclusion also precludes recovery for breach of contract from McLean or Spector. However, realizing its obligations to first consider class certification, *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Doctor v. Seaboard Coast Line Railroad,* 540 F.2d 699, 707–09 (4th Cir.1976), the Court will not grant defendants summary judgment now. It will deny plaintiff's motion and amended motion.

*Class Action Certification*

■ Defendants have raised objections to class certification based, *inter alia,* on plaintiffs' failure to timely move for certification. The Court will not, however, place the burden of this default on the class which plaintiffs purport to represent. Defendants were not prejudiced by the delay. It will extend the time for requesting class certification to the day plaintiffs filed their request and will rule on that request.

Plaintiffs request that the Court certify a class under Fed.R.Civ.P. 23(b)(3) defined as all casuals employed in North or South Carolina who (a) were not paid the additional $.50 per hour, with a maximum of $4.00 per day, called for by Article 53 of the Carolina Freight Council City Cartage Supplemental Agreement (1) by defendant Spector at any time during the

---

**6.** Yet, he was ultimately paid as a preferential.

period May 30, 1976 until March 31, 1979 or (2) by defendant McLean at any time during the period May 30, 1976 until January 17, 1977 and (b) for whom no employer made health and welfare contributions during the period of nonpayment of the additional $.50 per hour pursuant to said Supplemental Agreement.

 Assuming as it must for certification purposes that plaintiffs' claims have merit, the Court may preliminarily look at the evidence presented to see if a class action is properly maintainable. *Doctor v. Seaboard Coast Line,* 540 F.2d at 707–09. Plaintiffs have the burden of demonstrating that this action is properly maintainable as a class action. *Doctor v. Seaboard Coast Line,* 540 F.2d at 706; *Carracter v. Morgan,* 491 F.2d 458, 459 (4th Cir.1973); *Poindexter v. Teubert,* 462 F.2d 1096, 1097 (4th Cir. 1972). Here, the prerequisites of Fed.R. Civ.P. 23(a) & (b)(3) are clearly met for a class of lesser scope than that which plaintiffs seek.

Plaintiffs have not developed evidence of attempts to exhaust collective bargaining agreement remedies before March 10, 1977, as to locals besides Local 391. Evidence as to the knowledge of representatives of other locals of McLean's or Spector's failure to pay is not developed. Merely within Local 391 the class is so numerous that joinder is impracticable. As to imposition of an improper filing deadline, common questions of law and fact exist for all casuals in North and South Carolina. However, depending upon efforts of casuals at other locals to exhaust the grievance procedure in 1976 or early 1977, the questions of exhaustion and futility for them may differ from those posed by casuals represented by Local 391.[7] The same distinction applies to the typicality of claims. Defendants question whether plaintiffs would fairly and adequately represent even casuals within the jurisdiction of Local 391. Defendants' reservations are well taken. Yet, from all appearances from the file, plaintiffs through their attorneys are vigorously pursuing this action on behalf of the entire purported class as well as themselves.

Finally, the Court finds that questions of law and fact concerning Local 391's failure to process grievances and unfair union influence at Carolina Bi-State Grievance proceedings predominate over questions affecting only individual casuals represented by Local 391. The Court has insufficient evidence to make that determination for other locals. If for no other reason, the small size of each individual's stake in this matter makes a class action superior to individual suits. Class members should have no great interest in separately controlling the handling of their claims. The Court is aware of no prior action concerning this controversy. The existence of employment records should foster easy management of class matters.

 Therefore, the Court will certify a class defined as

all casuals represented by Local 391(a) who were not paid the additional 50 cents per hour, with a maximum of $4.00 per day, as required by Article 53 of the Carolina Freight Council City Cartage Supplemental Agreement (1) by defendant Spector at any time during the period May 30, 1976, until March 31, 1979, or (2) by defendant McLean at any time during the period May 30, 1976, until January 17, 1977, and (b) for whom no employer made health and welfare contributions during the period of nonpayment of the additional 50 cents per hour pursuant to said Supplemental Agreement.

*Plaintiffs' Motion to Compel Discovery*

Plaintiffs seek to make the companies disclose the number of casual workers in all of North and South Carolina. The ruling on class certification obviates the need for this discovery. The Court will deny plaintiffs' motion.

---

**7.** The record contains some scant evidence of pre-March 10, 1977, complaints at Local 28. However, without fuller exploration of those complaints, the Court cannot discern whether questions common to Local 391 casuals exist as to those represented by Local 28.

*Consolidation*

██ Plaintiffs seek consolidation of this case with *Overton v. McLean* and permission to file a consolidated complaint. As discussed in an Order, filed in that case contemporaneously herewith, that case is nearly identical to this one except for a different named plaintiff and additional defendants. Therefore, the Court will grant plaintiffs' motion despite the suspicion that *Overton v. McLean* was filed to side step discovery orders and avoid the need to request leave to add defendants in this case. It will also allow plaintiffs to file their proposed consolidated complaint. That complaint contains nothing new which would prejudice defendants.

IT IS, THEREFORE, ORDERED that the following motions be, and the same hereby are, DENIED:

(1) Plaintiffs' motions to amend;

(2) Plaintiffs' motions to strike affidavits;

(3) Plaintiffs' motion and amended motion for partial summary judgment;

(4) Defendants' motions for denial of class certification; and

(5) Plaintiffs' motion to compel discovery.

IT IS FURTHER ORDERED that the following motions be, and the same hereby are, GRANTED:

(1) Plaintiffs' motion to offer into evidence the Flynn Deposition for purposes of the motions considered herein; and

(2) Plaintiffs' motion for extension of time to move for class certification.

IT IS FURTHER ORDERED that plaintiffs' motions to consolidate and to file a consolidated complaint be, and the same hereby are, GRANTED. This action hereby is consolidated with *Overton v. McLean Trucking Co.*, C–80–381–WS. Let the Clerk file plaintiff's proposed consolidated complaint this date and all future matters concerning these consolidated cases in the file numbered C–79–388–WS.

IT IS FURTHER ORDERED that plaintiffs' motion for class certification be, and the same hereby is, GRANTED to the extent defined herein. Counsel for the parties shall confer and, within twenty (20) days of the date of this Memorandum Opinion and Order, submit a proposed notice and plan for notification of class members[8] at plaintiffs' expense pursuant to Fed.R.Civ.P. 23(c)(2).

IT IS FURTHER ORDERED that ruling on defendants' motions for summary judgment be, and the same hereby is, STAYED pending completion of the class notification procedure.

ORDER OF DISMISSAL

On September 25, 1981, the Court consolidated these cases and ruled that they should proceed as a class action. The Court considered the parties' cross motions for summary judgment and indicated that it would grant the defendants' motions and dismiss the consolidated action, but stayed final ruling pending completion of class certification. After consultation with the parties, the Clerk, on January 6, 1982, mailed class action notices to all potential class members identified by the parties. Notice of Class Action & Certificate of Mailing (January 6, 1982). The case file contains exclusion requests from 35 persons. The Clerk has filed his certificate indicating that 29.38% of all notices have been returned as undeliverable. All parties have indicated satisfaction with the method of notifying class members and request no further notification effort by the parties or the Court. *See* Letters rec'd February 12, 16, 23 & March 1, 1982. Class certification and notification of class members has now been completed.

IT IS, THEREFORE, ORDERED that the stay entered in these cases on September 25, 1981, be, and the same hereby is, VACATED. IT IS FURTHER ORDERED that, based upon the reasoning contained in the Court's Memorandum Opinion and Order dated September 25, 1981, the defend-

---

**8.** The *Manual for Complex Litigation*, Part 1, § 1.45 and Part 2, § 1.45 may be of assistance to counsel in preparation of the proposed notice to members of the class.

ants' Motions for Summary Judgment be, and the same hereby are, GRANTED and these actions hereby are DISMISSED.